Case No. 19-1063, Program Suppliers, Appellant v. Cochrane, Rose, Yvonne, and Elle. Mr. O'Leary for the Appellant, Mr. Tutero for the Rep, and the Appellees. Mr. Lanneran, did I say that correctly? Yes, you did. Oh, good. Thank you. Good morning. Good morning. May it please the Court, my name is Gregor Lanneran. I'm Counsel for Petitioner on Program Suppliers. Your Honor, we urge the Court to rule in favor of Program Suppliers for a couple of reasons. First, the Copyright Royalty Judge's final determination is not a product of reasoned decision-making. Second, the Copyright Royalty Judge has arbitrarily excluded the corrected testimony of one of Program Suppliers' critical witnesses. As an initial matter, the standard of review in this case is the APA standard of review. The government contends that the operative standard in this matter is the exceptionally deferential standard. That is not correct. The exceptionally deferential standard is a long-discarded standard that was actually replaced many years ago by the APA. So the APA is the operative standard in this case. The APA is a much less deferential standard. It is required, among other things, of reasoned decision-making by the agency, as well as conclusions that are supported by substantial evidence. APA review is pretty deferential with regard to determinations that are bound up in these complicated judgments about how best to model, which regression to use. That's correct, Your Honor. The APA standard is deferential. Agency decisions, in general, are deferential. But there is a distinct difference between the APA standard and the exceptionally deferential standard. And I think the NAB case, I think in 1998, goes to great lengths to explain the difference between these two standards. The final agency determination lacks reasoned decision-making because the comparability judges adopted a shared allocation methodology based on inaccurate and incomplete record. And we now know this because very recently we had a revelation about documents that were supposed to be producing discovery. During the case, there were not. Longly short of the effect of this, not only do we have a very serious discovery violation, we also have during-life testimony misrepresentation of the extent of the witness's work by the witness when he was being questioned. And that included not just the number of regression models that we now know the witness conducted, but also the extent of their regression work and the type of regressions that the witness conducted, as well as the timing of when the witness conducted these. Are you speaking now about the evidence that arose in the satellite proceeding? Yes, Your Honor. But program suppliers settled that. Isn't that correct? That's correct. But that does not detract from the fact that we now found that we have evidence that was supposed to be produced in a prior proceeding that we did not know of. The critical point of this is that the judges relied principally – Could you have obtained that information through discovery? I'm sorry, Your Honor? Could you have obtained that same information through discovery? Yes, we would have. We actually did propound discovery on commercial television and claimants who were the authors of the response of the witness that produced the document that performed the regression. And during that discovery, they told us that they had produced all responsive documents, which is – What, did you ask for all regression analyses performed? We usually ask for all underlying documents. I don't want to know what you usually do. I want to know what you ask for in this case. We ask for documents responsive to the witness's work. And one of the judges – I guess this is a specificity thing. I'm sorry, Your Honor? Is your argument here that you asked for this specific information and somehow someone had an improper, unlawfully sufficient response to discovery? Or you asked, but maybe you didn't have the targeted question that you should have, and now you've discovered – Had we only known, we would have asked for the 600 regression and tract regression analyses. I understand what you're saying. We generally – we asked for documents underlying the witness's regression analysis. There's a regulation within the – the judges regulate – And the other party objected as overbroad, right? There was – I don't recall precisely, but I know that there was a – there almost always is a general objection at the beginning of the response. Right, and then what did you do after that objection? I'm sorry, Your Honor? What did you do after that objection? We did not do anything. The important point, though – You didn't – so time out. Sorry. Sorry, because to me at least this is relevant. So did you do anything to enforce your discovery request? Not when they responded to us that there were no additional responsive documents. I thought the response was that your request was overbroad. So then did you do a narrower one? It was a general – it was a general objection that was at the beginning of the question itself. Sure, and then what did you do? Then what did you do? But generally – To get this information. We didn't do anything because we didn't know the information existed in the first place. Well, that's what discovery is for. I'm sorry? That's what discovery is for. Yes, but – So you didn't do anything when they objected. You just let it go. But when the party responds, objecting – you can object when you have the document and you don't think that – you think this grounds for not producing it, but an objection is not valid if the witness says – if the responding party has the document but says that he is – and is obligated to produce it and fails to do so and responds that it has produced all responsive documents. The critical point about this is the way that judges discover regulations work. You have to produce not just documents underlying your testimony that you presented to the royalty judges. You also have to produce alternative actions considered. This was the trick. They did not produce those documents. They turned out to be critical because the regression analysis was what the judges relied on for the purposes of determining the shares. And here are the consequences of this. Not only was there a serious discovery violation, the witness on the stand was questioned in any number of ways about whether or not he performed additional regressions. He said no. In some cases, he couldn't recall. They asked him about the types of regressions that he performed. He denied that he performed them. It turns out there are 600-plus regression models that the witness performed that never saw the light of day. The judges, in turn, never had an opportunity to question the witnesses about those 600 and how the witness arrived at providing written testimony only for two regression analyses. And not only did the judges not have an opportunity to question the witness, program suppliers never had an opportunity to do so either. The consequence of this is that the judges relied on – Did you guys ask this witness? I'm sorry? Did you guys ask this witness at the hearing how many regression analyses did you perform? We did not, but another party did. Why didn't you? Well – You say it's really important to know how many regression – you just made a powerful argument for why it's important to know how many rounds they went before they got the answer they're testifying about, so I'm curious as to why you wouldn't have asked that at the hearing. But, again, when the responding party says we have no additional responsive documents, that's where it stops. And we have no reason – we take it on good faith that the parties have no additional documents to produce. Another party moved to strike the testimony because they hadn't been sufficiently responsive, but you didn't do that. We did not do that, again, but there was another party that did that, but – Nothing would have stopped you from asking just to confirm if this is really that important at the hearing. You could have asked how many did you do, but you didn't. No, the parties had already responded that there were no additional documents. When a party says there are no additional – Well, in response to your discovery, they just said it was overbroad. Well, overbroad compels you to return and ask, well, can we narrow the discovery, can we narrow the question? But usually when the responding party says we have no more documents, we take it on good faith that there are no more documents. So we don't pursue that discovery. This is very different. This is a situation where the parties responded that they had no documents and had no responsive documents. It's very different from where we object to the question you're asking. There's a lot of real estate between objecting to the question versus saying we've given you everything that's responsive to your question. And this is what happened in this case. And in the motion to strike case, and the ruling – the judges finally ruled that the party that sought to strike the testimony should have a move to compel. That ruling did not come out until the hearing was over. So even if we had an opportunity to compel, we could not have done so because the proposed findings had already been submitted in that case. So this is the critical – this is one critical point. The inaccuracy of the record and incompleteness of the record alone, beyond anything else, is sufficient to remand this case. Because the judges had no knowledge that 600-plus regressions were out there that they could have taken into consideration, which not only affects the way the judges looked at the evidence, but it also affects the credibility of the witness, to be quite honest. So that is the one reason. There are other problems with why this was not reasoned decision-making. The other problem is that the way that the judges treated precedents in this case is also not based on reasoned decision-making. There have been two – the last two decisions in this case, the 1999 royalty years and the 2004-05 royalty years, both employed survey evidence. You say the way they've treated precedent. Usually when we talk about an agency changing positions and having to explain itself, the change is with respect to some legal issue. Here, the change – there's a change in the sense that there were prior determinations in which the agency emphasized surveys as opposed to regressions. Here, they use the regression as a starting point, and then they look to surveys. It seems different, and to the extent every case is different, they've explained. They've given reasons to think why this regression analysis is better than ones that were tendered in the prior cases. It doesn't seem problematic to me. Well, in the 2005 program supplier's decision, which we were on that case also, the judges had started – the copyright royalty judges had started moving from the viewing methodology – I'm sorry. The viewing methodology towards the survey evidence. And the court – this court recognized that the movement, the shift from viewing methodology to survey evidence was a departure from precedent, and that the judges properly explained provider reasoning for that. So something similar has happened here, except that there is no – first of all, they moved – the judges moved from survey evidence to making regression analysis a starting point. In prior proceedings, regression analysis – Well, they said they relied on both. I'm sorry? of all these answers, and so we conclude that the Horowitz survey and Professor Crawford's regression analysis with adjustments together are the best available measures. They weren't abandoning surveys. In the past, they had done – looked at the regression analysis to sort of support the surveys. And here they said this is a much better regression analysis, so we're going to look at both pieces. These two – they went through all the pieces of evidence, and these two other ones, and we're going to look at them together. That's what we're relying on. So they're quite express about what they're doing. They do talk about, you know, in the past we've done more of that, but here's the problem with the surveys here, and here's the much improved regression analysis. So it seems to me they were quite up front about – acknowledged what they were doing, acknowledged what had happened in the past, and explained why they did what they did, which seems to me entirely sufficient. I have about eight more seconds, but I want to please answer your question. There are a couple of points on that. The judges – that determination was actually very inconsistent. They said in the same kind of determination that they were treating the Crawford regression analysis in the same manner as the Waldfogel analysis, which was in the prior decision. The fact is they did not. In the prior determination, the Waldfogel analysis was treated as corroborative evidence. This one was much better. This one didn't have a lot of the problems. That goes to my next point, Your Honor. Just because it's better does not make it better than the decision that – the way that the survey evidence has been treated in the past. As a matter of fact, the board survey was the evidence that was – that has been – that was used in the 1999 royalty determination as well as the 0405. They found that the Horowitz – the Horowitz survey evidence most reflects relative value of the – Well, they said that relative to the other surveys. That wasn't compared to the other surveys. At the end, they talked about how Horowitz fit in with all the other methodologies. So that's all they said there. I understand that, but my point – my point is simply saying that the data that we have for regression is better just as the data for the Horowitz survey was better as compared to boards. Just almost all – it's not unusual for methodological presentations to improve over time. The point is, did this improve – Are the royalty judges allowed to respond and change how they value those methodologies based on their improvements, or are they stuck with how they responded to the first round? They have – they have the discretion to do that. My point is that they did not explain the shift. Not only did they not explain the shift. I mean, the regression analysis has massive problems. So even if we disagree on whether or not one was better than the other, in this record, based on the new revelations that we have, 600 regression models – Well, if we put that aside, then what would you say about the regression analysis? I would say that they did not explain it. They found the survey evidence that had been relied on from proceeding to proceeding. They found another survey evidence that's actually better than that. But the link they did not make was why was the regression analysis better than the survey evidence. Whichever survey evidence. In this case, it happened to be the Horowitz survey. They didn't have to say better. They said we're going to rely on both of them. Well, it's – there's a big difference between – as an aside, by the way, the parties that presented the fees-based regression, both parties did not present this regression analysis as principle evidence. They presented them as corroborative of the survey evidence, in this case, the BORS evidence. So the parties themselves did not argue for this to be principle evidence. And there are inherent flaws with regression analysis overall. One of the key flaws of the regression analysis is the fact that the regression analysis is not a market value concept. All of the data that are key to regression analysis are data that are extracted from the regulatory scheme. The regression purports to show a relationship between programming minutes and fees paid by cable system operators. But that is not the case. All of the information that makes up the regression model is based on – are not free of the strictures of a free market, which they're supposed to be in order to make it a market value concept. All right. Thank you very much. Thank you. May it please the Court. Martin Totaro on behalf of the Copyright Royalty Judges and the Library of Congress. The challenge for the Copyright Royalty Judges in this proceeding was to decide how to allocate fees the government has collected to copyright owners that provide content to cable systems. Now, the problem is that the fees are set by statute rather than the market, and the amount of fees don't generally vary based on the type of programming. So on this record, there were multiple different methodologies, and the Copyright Royalty Judges used the methodology offered by Dr. Gregory Crawford as a starting point in his analysis. That choice was eminently reasonable. Cable systems decide which distant broadcast systems to retransmit to their subscribers. So they have a menu before them, and then they have to pick which particular programs to retransmit. Now, Crawford sought to establish a statistical relationship between the amount of royalties that a cable system paid and the value of that particular programming. So the regression he looked at improved on prior regression analyses in multiple ways, as thoroughly discussed by the Copyright Royalty Judges in the final order. The biggest improvement is that he eliminated sampling in collecting his data. So he had the entire universe of programming for the four years at issue here retransmitted by the Form 3 cable systems. That's a difference in measurement between using an abacus and a calculator. Now, that's the principal advancement. He also looked at every year instead of a sample year, and he also used what's called a fixed effects analysis, which looked at differences within particular cable systems in something called the subscriber group, which was made possible by a congressional amendment, a congressional enactment in 2010, that allowed all of this data to be collected at the subscriber group level, and that allowed Crawford to have many thousands more data points when constructing his analysis. The Crawford analysis is by no means perfect. There is, as this Court recognized in its 2005 Settling Devotional Claimants decision, necessary imprecision because we have this mismatch between trying to replicate a relative marketplace on the one hand and a compulsory licensing scheme on the other. If there are no particular questions about the Crawford analysis... I'm stepping in dangerous waters here, but I don't know if you're able to just explain to me how... I didn't see the royalty judges laying this out, but if they did, you can point me to it. So as I get it, what Crawford did was he correlated the number of minutes of viewership and the amount of royalties paid for each category. Yes, Your Honor. Is that right? Which essentially produces dollars per minute of viewing. Yes, but it's... How does that show? To not make things overly complicated, it would be very easy to just add up minutes broadcast with total minutes by all the categories, but the difficulty here is there are many, many potential confounding variables that get in the way. And so what Crawford did in his regression analysis, and this starts at JA-910 where he sort of lays it out in his Appendix A, the different control factors he used including, for example, whether a particular cable system has availability of a certain type of programming, the number of subscribers, and things of that sort. So he's controlling a lot of stuff, but at the end of the day he was just showing dollars per viewership minute? Well, he's trying to establish a relationship between the choices that a cable system makes in the types of various programming it chooses. And so the idea here is that a cable... Yeah, I still get how the dollars and the viewers show up. It's not viewers. It's the amount of material made available to viewers as opposed to viewership numbers in and of themselves because on this record and elsewhere it's pretty easily demonstrated that viewership isn't a proper number. And so he's looking at the types of programming that particular cable systems at the subscriber group level pulled and then retransmitted to their individuals. And so from that determination you can add up the total number of minutes in, for example, the sports category or the program suppliers category or the public television category. And so one of the nuances of Crawford's analysis is that he found out that he used a metaphor, what he called sort of a fixed price buffet. He talks about this on JA 1481 that you can determine value by looking at differentiated programming. So, for example, if there are two sorts of sitcoms from the 90s that are reruns that are being transmitted, the subscriber might not care whether it's one particular sitcom or the other. But if there's some sort of niche programming that you really can't find anywhere else and that's unique and then the cable system picks up that particular program and retransmits it, then that has a particular type of value. So then Crawford and the particulars of the regression are laid out at JA 913. He was able to take all this information and come to a permanent or marginal basis for the value for each particular type of the six different categories that issue here. And then he was able to look at the total number of minutes transmitted, which, again, because he didn't use sampling, to arrive at the particular allocation percentages. So at the end of the day, he showed minutes that each category was transmitted? Controlled for a variety of other different factors. But the payments didn't matter at that point? Just what they were choosing to transmit the most of? Yes, but he had to look at the total number of payments and you pay for a particular, what's called a distance signal equivalent that has an array of particular programs. So the royalties didn't come into the analysis. It did not? It did. So here's, I had a similar befuddlement. When you say, you frame this as the regression seeks to correlate marginal changes in hours to royalties. Yes, Your Honor. And I thought that's very perplexing because royalties is not a market, it's a statutory formula. It is perplexing and that's the problem. And then my law clerk explained to me that the royalty formula, the way that works is you just pay, it's a percentage of revenue. You opt into this program and then you pay whatever, 1% of your revenue or whatever. Yes, Your Honor, that's correct. And so then I thought, well, okay, what you're really saying is you're correlating on the margin hours to revenue. So if, you know, other things equal you from one year to the next, you add an increment of sports programming and then it turns out your revenue goes up by a certain amount, controlling for everything else, that seems like it's a rough measure of marginal value. And so my question is, A, am I understanding all of that correctly? And B, if I am, why don't you just express the regression as correlating marginal hours to marginal revenue? Your Honor, I don't think it's a revenue analysis. I think it's keyed toward the fees paid under the compulsory licensing scheme and the minutes transmitted not viewed factoring in a variety of these other particular control variables. Because it's important to sort of put this distant retransmitted signals in overall context. These are going out under- Am I right or wrong that fees paid, royalties paid by the cable stations are directly proportional to their revenues? Yes, that's correct. The form three systems pay, I think it's a little more than 1% or something like that. So you're correct that it's based on revenue in that sense, yes. How does that correlation show? Because I thought this is what he was saying. How is that correlation that you're talking about between minutes and I thought it was royalties. How is that going to show the desire to maximize profits by obviously broadcasting the stuff that people will get you the most viewers? I think the idea, Your Honor, is that you're picking different types of programming from an array of available programming. And these are going out on stations that have been bundled with lots of different programs. So what Crawford had to do was look at not only the station being retransmitted, but then also factoring the amount of minutes on that station in the different categories. And so I think taking all the control variables aside, the general purpose is if you're retransmitting more of a certain type of category, that category has more value. If I could move to the issue of the 600. It's only going to have more value if it results in more subscribers, right? That is always the goal of the cable system. And the idea that Crawford then inferred is that if you're putting out a particular program, it's for the purpose of attracting or retaining a subscriber. So that is related. If I could address the purported 600 preliminary regression analyses, I think our argument is set forth in our motion opposing the remand that we filed on September 12th, and I'd just like to add two minor points. The first is that, as Judge Rob pointed out, the satellite allocation proceedings have been settled, and program suppliers agreed to that settlement. Second, and probably more importantly, it's not surprising that an incredibly complicated regression analysis has preliminary analyses. Now, the judges, because the case settled, had no ability to decide on the validity of that challenge, whether they actually were preliminary analyses, whether they needed to be turned over, things of that sort. But the critical point on this particular record is that program suppliers could have developed it, but chose not to or did not. And second, Crawford, comprehensive, complicated, whatever word you want to use to describe Crawford, it's also 100% transparent. And so his entire record, his entire analysis, which starts on, I think, 866 of the Joint Appendix, is transparent for everyone to see, for everyone to criticize. Did it reveal the 600? It did not reveal preliminary analyses, but it revealed all the data that went into the model. It revealed the control. Their point, if I understand it correctly, I don't mean to put words in their mouth, is that, well, if you do it 600 times and those results are all over the place, it looks like the one you waited, you did it and did it and did it until you got the one you like. And then you put it all up with the nice analysis and made it look good. But if we knew that you had actually done a bunch of other 600 of these, it took you 600 times to get the one that looks good for purposes of this hearing, that would have really affected your credibility. The looked good is, I think, where the argument fails. If there's something wrong in that particular regression model, the parties can point that out. And I would just focus on how program suppliers, even in this appeal, is only focusing on two particular aspects of Crawford's regression model. First, the allegation that it can't be replicated. That's plainly incorrect. Expert Gray said he didn't... No, yeah, I thought they were making it different. I get the argument about replication. I thought their point was this is whole new evidence that... He ran this thing 600 times, which is way over the top, on what you do to prepare a regression analysis in a context like this. And those results were all over the place, which show either he just ran it until he got the answer his clients wanted and then made it look real nice and turned it in, or there's something just really wrong with that methodology that it has all these different results when you look at what happens when it's run again and again and again. In a way that's relevant in a way that's got nothing to do with replication. And the copyright royalty judges could have addressed those arguments had that sort of argument been developed before the judges through discovery. But the record as it sits before the copyright royalty judges in this case, in this court now, those 600 purported preliminary analyses aren't before the court. Well, they're not because, at least there was another party who moved to strike this testimony because this information hadn't been disclosed. And the royalty judges said no, and that was before the hearing. So they set up this whole problem. The royalty judges said no. As the court well knows, it grants extreme deference to how royalty judges conduct their discovery. Why wouldn't you let people see the preliminary tests? What was a good reason for not letting them before the hearing have access to this discovery? So to be clear, the copyright royalty judges have taken no position whatsoever on whether that discovery should have been turned over or not. All I'm really saying here is that nothing precluded... Well, they had a ruling before the hearing when someone said we can't have this witness in because they haven't given us enough information about the tests and everything underlying his testimony. And they said no. There was a motion to strike that was denied. That wasn't appealed, and it certainly wasn't in the opening brief or anything like that. And now we have a record where we have Crawford's information for all to see and criticize, and their criticisms are respectfully minor and substantial. And now there is this argument that there were preliminary analyses, but they simply could have developed that in the record before this court just as they did in the satellite allocation proceedings that have now been settled. I see my time has run. I'm happy to answer any other questions about any aspect of the case. No, we appreciate your presentation. Thank you. Thank you, Your Honor. Does Mr. O'Lantern have any time left? Okay. We'll give you two minutes, Mr. O'Lantern. Thank you, Your Honor. Just quickly, Your Honor asked me a question earlier about what was the language of discovery request, and you'll find that on page 4 of our motion to remand where we articulate the question, where we repeat the questions we ask. The response was that beyond the documents and data produced previously by CTV, that's commercial television claimants, and the additional documents and data being produced today, there are no other documents to be produced in response to your request. So that was how they responded to her question. I just want to touch really quickly on the problem, on the fundamental problem with the regression analysis. The regression analysis, the standard for allocation relative is the relative marketplace value. All of the data, again, that goes into the regression analysis does not come from the market. It comes from the data. The relative payments that are being analyzed are relative payments that are required to be paid by statute. The statutory requirement really dictates what drives royalties. There are three principal components. If it's the case that your royalty payment is a percentage of your revenue, that's what I was asking your friend about. By statute, it is a percentage. There are three components to the royalty payment. Grocery sheets of the cable system, the type of stations that the cable system carries, and the number of those types of stations, the combination. Those are the elements that drive the royalty payments. There is no combination on any station or a combination of stations. There's no combination or mix of programming. But the greater the revenue for the cable company, the greater its royalty payments. That's correct. So as a just very rough way of thinking about kind of how to approximate a market where there is no market, what's wrong conceptually with saying we'll look at how you change the programming on the margin and how royalties, which correlate to revenue, increase? I think that's a very important question. When we don't have that market, then you have to look for information about the market that will drive your estimation. The behavior of the cable systems is based solely on the regulation at that point. And to the extent that you want to look at something like that, you might look at Dr. Gray's analysis where there's a minimum payment that's required, regardless of whether you're carrying one or none. There's a minimum payment required of cable systems that don't carry any additionally retransmitted signals. And Dr. Gray did an analysis that's in the record about what happens when you look at those systems that actually choose to pay more than the minimum payment and what that behavior is like with respect to the program, with respect to the distribution of the shares. That's a dramatically different result than you wind up with. And I think that's actually closer to your question in terms of, well, what do you do? Your question, which is, well, if I only have to pay the minimum fee, why am I paying these additional fees? And I think that's closer to your question because the behavior of those paying additional fees is, I think, that Dr. Crawford attempted to model in his regression. And finally, Your Honor, you asked me earlier on, you quoted from the Final Determination the consistency of language that the Final Determination uses. And I'd like to direct you to page 26 of our opening brief that shows, actually, that there were more inconsistencies than the Final Determination actually reflects. Thank you very much. Thank you, Your Honor.
judges: Millett, Katsas, Rao